Filed 4/14/23  P. v. Reyes CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JESSICA CHENNEL REYES,<br><br>Defendant and Appellant. | F083247<br><br>(Super. Ct. No. 18CMS5330)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Michael J. Reinhart, Judge.

Richard M. Oberto for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Christopher J. Rench and R. Todd Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Defendant Jessica Chennel Reyes, who had no criminal record of significance at the time,[1] was arrested in October 2018 following an unusual sequence of events that began with a random encounter between defendant and her cousin and a group of four strangers early one morning. As defendant's cousin and one of the men in the other group fought in the street, defendant drove away from the scene in the other group's car. A 17-year-old girl with the other group was in the passenger seat of the car, held there by defendant's grip on her hair. Defendant drove first to her own house and then, with her mother driving and two other relatives in the car, traveled with the victim to her cousin's house. The events ended there, after the victim's group tracked a cell phone signal to the residence.

Defendant was charged with and convicted by jury of kidnapping by force or fear (Pen. Code, § 207, subd. (a); count 1),[2] child abuse likely to produce great bodily harm or death (§ 273a, subd. (a); count 2), and assault with force likely to produce great bodily injury (GBI) (§ 245, subd. (a)(4); count 3).[3] The trial court sentenced defendant to the lower term of three years in prison for kidnapping and concurrent lower terms of two years each for child abuse and for assault.

Defendant timely appealed. The trial court instructed the jury with CALCRIM No. 225 (Circumstantial Evidence: Intent or Mental State), and defendant claims the court erred when it also instructed the jury, sua sponte, with a modified version of

---

[1] The probation report reflects defendant was placed on probation in 2003 for a misdemeanor violation of Vehicle Code section 23152, subdivision (a), and her insignificant criminal record and satisfactory performance on probation were recognized as mitigating circumstances during sentencing.

[2] All further statutory references are to the Penal Code unless otherwise specified.

[3] Defendant was also charged in the information with a fourth count, false imprisonment, and the jury was instructed that false imprisonment is a lesser included offense of kidnapping. (*People v. Eid* (2014) 59 Cal.4th 650, 656.)

CALCRIM No. 225 applicable to her defenses of legal necessity and self-defense or the defense of others. Second, she claims that the court misstated an element when it instructed the jury on count 3 with CALCRIM No. 875 (Assault with Force Likely to Produce GBI). If we find either instructional error claim forfeited for failure to object in the trial court, defendant claims she received ineffective assistance of counsel. Finally, defendant claims that under section 654, the court erred in failing to stay her sentence for either child abuse or assault.

As anticipated by defendant, the People argue that her instructional error claims are forfeited for failure to object. Alternatively, they contend that the trial court's instruction with a modified version of CALCRIM No. 225 applicable to defenses was neither erroneous nor prejudicial, and that the court's misstatement of law in instructing with CALCRIM No. 875 was harmless. They also disagree that section 654 applies in this case.

As discussed herein, defendant's characterization of the modified version of CALCRIM No. 225 as weakening the prosecutor's burden of proof, creating a mandatory presumption of guilt, or otherwise confusing the jury with respect to the prosecutor's burden of proof or defendant's guilt is directly contradicted by the record. However, assuming it was error to give the modified version of CALCRIM No. 225 in this case, the error is harmless because "it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the error ...." (*People v. Watson* (1956) 46 Cal.2d 818, 837 (*Watson*).) Further, we find that the trial court's misstatement of an element of assault in count 3 was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)

Finally, as to the application of section 654 in this case, it is undisputed that defendant committed the crimes of kidnapping by force or fear, child abuse, and assault during a single course of conduct. Rather than elect specific acts to support specific charges, the prosecutor relied more broadly on defendant's different actions and victim's

3.

different injuries throughout the course of conduct to support the three charges.[4] We find substantial evidence in the record to support a finding that defendant had the opportunity to reflect between the offenses committed during the drive to her house and the offenses committed during the drive to her cousin's house. (*People v. Fuentes* (2022) 78 Cal.App.5th 670, 680, quoting *People v. Beamon* (1973) 8 Cal.3d 625, 639, fn. 11 (*Beamon*) ["[A] course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment."].) However, there is not substantial evidence that defendant possessed independent criminal objectives or that the course of conduct was further divisible such that defendant may be punished for all three offenses. Therefore, the trial court erred in failing to stay one of the three sentences under section 654.

Accordingly, this matter shall be remanded to the trial court with instructions to stay the sentence on one of the three counts under section 654. The judgment is otherwise affirmed.

**FACTUAL SUMMARY**

I.      **Prosecution Case**

        A.      **Street Fight and Taking of Car**

                1.      **C.R.'s, Anthony's, and Dylan's Testimony**

In the early morning hours of October 21, 2018,[5] 17-year-old C.R.; her then-boyfriend 18-year-old Anthony; 18-year-old Bryan; and 16-year-old Dylan, were on their way to Freedom Park in Hanford.[6] C.R. was driving a Toyota Corolla that belonged to

---

[4]     The jury was given a unanimity instruction. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 [California "cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act"].)

[5]     Unless otherwise specified, all further date references are to the year of 2018.

[6]     C.R., Anthony, and Dylan testified at trial, but Bryan did not.

4.

Bryan's sister and she, Anthony, and Bryan had just picked Dylan up at his house. As they drove on Leland near 10th with the car windows down, they passed defendant and her cousin, Caleb, whom they did not know, walking down the street on the sidewalk.[7] When they drove by, Caleb flipped their car off and yelled at them. C.R., Anthony, and Dylan denied they had yet done or said anything, but C.R. made a U-turn and stopped the car across the street from defendant and Caleb.

Bryan and Caleb argued with one another. Caleb, who seemed drunk to Dylan, wanted to fight, and he called Bryan "a pussy" and "a bitch." Bryan got out of the car, and he and Caleb, who were around the same size, began physically fighting in the street. C.R., Anthony, and Dylan also got out of the car and stood at the rear by the trunk watching. C.R. testified that the car doors were left open, the engine was running, and they left cell phones in the car.

C.R. and Dylan testified that Caleb was threatening to kill Bryan, and Dylan stated that defendant was telling Caleb to "beat [Bryan's] ass." As they were fighting in the street, Caleb placed Bryan in what was described as both a headlock and a chokehold. Although defendant continued to encourage the fight, when Caleb placed Bryan in a headlock/chokehold, Anthony, Dylan, and defendant went to intervene to ensure the two men could "fight more fairly." Dylan testified that Bryan "was losing air," and when he and Anthony tried to pull Bryan and Caleb apart, defendant pushed them away and expressed concern they were going to jump Caleb. Dylan and Anthony denied they were trying to jump Caleb or join the fight, and Dylan said the two never got closer than five or six feet from the fight because Bryan and Caleb then separated before continuing to

---

**7**     The two different groups of people involved in these events did not know one another at the time, but by trial, they knew of and, at times, testified using names. For the sake of clarity and because identity is not in question in this case, we summarize the events using the involved parties' names. This should not be interpreted as indicating that at the time of the crimes, the two groups were acquainted with one another.

fight. Anthony described pulling on Caleb's arm, however, before Bryan extricated himself and continued the fight with Caleb.

C.R. testified that she had remained by the rear of the car during the fight, and that defendant was standing between herself and Dylan, approximately six to 10 feet away. She and defendant had not exchanged any words, she was trying to record the fight with her cell phone, and Dylan was standing nearby.

C.R. also testified that as she tried to record the fight, a neighbor from a nearby apartment complex came out and asked what was going on. Defendant said, "Yeah, they're fighting," and then ran into the driver's seat of the car. C.R. said, "[B]itch, hold up," and went into the front passenger seat to turn off the car, which had an automatic start button.[8] They both swung at each other, making contact, and defendant grabbed C.R. by the hair with her right hand. Defendant maintained her grip on C.R.'s hair while using her left hand to try to place the car into drive. C.R. tried to keep the car in park, and the two went back and forth with the gear shift between drive and park several times. Defendant then succeeded in driving forward, which caused the car doors to shut. Dylan was holding onto the driver's side trying to open the door, and he told defendant to get out and asked why she was in the car. As the car started moving, C.R. told Dylan to let go and he did.

Dylan saw Caleb walking away and he, Anthony, and Bryan chased after the car. Once defendant drove around the corner, Dylan called his mother, and she picked them up. They stopped by his house so he could pick up a cell phone and track Bryan's phone, which was in the car with defendant and C.R. At some point, Anthony called his mother, Antonia, and she picked them up.

---

[8]     The jury viewed C.R.'s cell phone video. We requested transmittal of the exhibit and viewed it during the course of our review. The video is brief, the surroundings are dark, and the filming is very unsteady, but a fight between two men in the distance is discernible, as is defendant saying "they're fighting" before rushing to the car and C.R. saying "bitch" before video ends.

### 2. Caleb's Testimony

Caleb M. testified that at the time, he was 30 years old and living in Los Angeles. He was in Hanford to visit family, and he and his cousin, Micah, had spent the evening at Tachi Palace before returning to defendant's house. He had been drinking and felt intoxicated, but denied he was belligerent or was asked to leave defendant's house. However, he decided to walk to the nearby house of another cousin he was staying with, Madalynn, and defendant went with him.

When they were halfway there, a car passed by from behind and then stopped. Three males exited the car, leaving the doors open, and approached aggressively. One of the men asked Caleb if he was "talking shit" and punched him. Caleb defended himself, putting the man in a headlock. He denied he used a chokehold or that the man was unable to breathe. One of the other men tried to join in the fight, but Caleb kept the first man's body between them, preventing attack. He recalled the second man saying, "[L]et him go." He also recalled defendant standing there and saying they needed to keep the fight fair.

After the second man approached Caleb, the third man went toward the trunk of the car, and he feared the man was going to retrieve something from the trunk that could harm them. Defendant pushed the man away from the trunk, got in the car, and drove off, "remov[ing] it from the situation." After the car left, Caleb let Bryan go and the three men ran after the car. He stood there briefly and then walked away, eventually making his way back to Madalynn's house.

Caleb did not see a woman with the three men, and he did not hear a woman's voice. He also did not recall seeing a neighbor or hearing anyone ask what was going on, and he did not recall defendant saying, "[Y]eah, they are fighting." He denied anyone had to pull his arm off of Bryan and he testified that neither of the other two men touched him.

7.

## B. Events on Teakwood

Defendant drove the car with C.R. in the front passenger seat to her own house on Teakwood, which testimony established was 0.7 miles away from Leland and 10th. During the entire drive, defendant held C.R. by the hair, head down, although C.R. was able to glance around at times. C.R. testified that she tried to throw herself out of the car during the ride, but was unable to because defendant had her by the hair. Defendant kept telling her, "[Y]ou mess with my family you mess with me," and defendant said she was taking C.R. to her house.

When they reached defendant's house, defendant pulled C.R. out of the car by the hair through the driver's side door and started punching her. C.R. tried to punch defendant in return, but she was unable to run because defendant maintained a grip on her hair and her head was facing down. C.R.'s hoodie sweatshirt came up over her head during the struggle and C.R. then dropped to the ground on the driveway. Two women and one man, identified in later testimony as defendant's mother, Kathy, and defendant's cousins, Ashley and Micah, came out of the house. As C.R. pulled her hoodie off, she heard multiple voices, which sounded confused and frantic, referring to defendant as "Jessica," and asking her who C.R. was. Defendant responded that C.R. was "some dumb bitch," and defendant told them repeatedly that she did not know where Caleb was. The people also asked C.R. who she was and where Caleb was. C.R. told them she did not know where Caleb was, and that defendant left without him.

Defendant and the man pulled C.R. into the backseat of the car by her arms, and she was on her knees on the floor facing the backseat. A woman defendant called "mom" drove the car to a second house nearby, and defendant told her "[t]o pull her sleeves over her hands so that she didn't leave any fingerprints on the steering wheel or anywhere in the car." C.R. also testified that the second woman was in the front passenger seat, and the group was asking where Caleb was. During the ride, defendant hit C.R. repeatedly on the back, back of her neck, head, and face, and kept saying, "[W]e need to get bleach,"

8.

and "[O]h, do you think you are so tough now, you think you are so tough, you thought you were so tough." Defendant also kept calling C.R. "a bitch," and told her she was lucky they did not kill her.

### C. Events on Burl

After they arrived at the second house, which later testimony established was Madalynn's house on Burl where Caleb was staying, two or three people came outside. It was dark; there were no streetlights and only one porch light. C.R. was locked inside the car and people were coming and going from the car, asking her questions. Defendant also tried to get back inside the car, but every time she unlocked the back door and opened it, C.R. would shut it and lock it again. C.R. testified defendant was yelling and kept calling her "a dumb bitch," and everyone was asking who she was, where the men with her were, and where Caleb was.

The man who rode in the backseat with her and the woman who rode in the front passenger seat got back in the car, and questioned her. They asked her name, her parents' names, and how old she was. The man asked if she knew who he was and she said no, and the two checked the glove compartment. The man told her he was "from the res," and if they found out the car was under her name, they would "bust [her] head open with a bat and kill [her]." C.R. answered their questions, and after they informed defendant that C.R. was only 17 years old, defendant responded, "[N]o, she's not. She looks like a crackhead on the streets. She looks like she has to be about 21 or 22, but I know she's probably just a crackhead from the streets."

C.R. was not in possession of her cell phone, and she testified that when Dylan called her phone, defendant and her family answered. She heard muffled arguing and the group asking where Caleb was. She also thought Dylan, Anthony, and Bryan were on the phone, and she testified that Dylan said he did not know where Caleb was and asked where C.R. was. Just prior to answering Dylan's phone call, C.R. told the group that maybe he knew where Caleb was, and she could try to help them find Caleb. She

testified she did not feel safe, but thought if she offered to help, she might be able to escape.

At one point, another man got into the car and questioned C.R., and defendant tried to pull her from the car. C.R. testified defendant grabbed her leg, but she kicked defendant off. One of defendant's family members pulled defendant back and told her not to touch C.R. because she was only 17 years old.

Dylan, who was with Antonia, Anthony, and Bryan, testified that they tracked the signal from Bryan's cell phone to the residence on Burl. When they arrived, he saw C.R. on the ground with a black eye, swollen face, and messed up hair. She was holding her face and her nose looked like it was broken. The Corolla's doors were open, their cell phones were on the grass, and approximately six other people were standing around. Dylan described seeing a man with something wrapped around his hand asking for Dylan. As he, Anthony, and Bryan went to get in the Corolla and drive away, defendant came out of the house, called him "a bitch," and punched him in the face.

C.R. testified she was still inside the car when she saw bright headlights, and then arguing. She recognized Anthony's mother's voice yelling and asking where she was. C.R. also testified she saw defendant punch Dylan in the face and Anthony push Dylan away. Defendant's family pulled her back while Antonia got in between to push Anthony and Dylan away. C.R. saw a man with brass knuckles approach Anthony and Antonia push the man back. At some point after Antonia arrived with Dylan, Anthony, and Bryan, C.R. unlocked the Corolla door, got out, and ran to Antonia's car.

Antonia retrieved the group's cell phones and she left with C.R. After they drove around the corner, C.R. said to stop the car because she was having a panic attack and they needed to call 911. Officers with the Hanford Police Department were on their way to another location, saw them, and stopped, and C.R. spoke with Officer Avalos.

## D.    Statements to Law Enforcement

At around 2:36 a.m., Officer Avalos was responding to a call for service about vandalism and a man jumping fences near Leland and 10th when he saw three cars, one of which was blocking the road, and approximately six people.  C.R., who appeared to be around 15 years old to him, was sitting on the curb crying and she had what appeared to be facial injuries.  She told him she was inside a car that was stolen, and she was taken somewhere and beaten.  Avalos testified C.R. was "pretty frantic," and he had to ask her to slow down because her speech was very rapid and her narration of events jumped all over the place.

C.R. told Officer Avalos that she was driving with Dylan, Anthony, and Bryan when they saw defendant and Caleb walking.  Caleb yelled at them, C.R. stopped the car, and they all yelled at Caleb.  C.R. told the boys to get out of the car, figure out the problem, and solve it because she did not want the car to get hit.  Bryan got out first, he and Caleb started fighting, and the others then got out of the car, leaving the doors open.  Anthony tried to break up the fight because Caleb had Bryan in a chokehold, and defendant pushed Anthony because she thought Caleb was being jumped.

Defendant then jumped into the car and C.R. did the same because she thought defendant was trying to steal it.  Defendant attempted to hit C.R. and C.R. then started hitting defendant.  Defendant grabbed her hair, held her head down, and drove.  While she drove, defendant was saying "oh, you want to fuck with me," "[y]ou fucked with my family," and "[y]ou want to fuck with me, you are going to fuck with everyone."  She also told C.R. she was taking C.R. to her house.  C.R. stated she was unable to get out of the car because she was being held down by her hair.

Officer Avalos did not remember C.R. stating that defendant egged anyone on or told Caleb to kill Bryan, but C.R. told him defendant yelled to go get bleach because she was "going to kill this bitch."  C.R. did not mention or show him the cell phone video she took.

11.

During this time, Officer Avalos was aware, based on radio traffic, that Officer Farr was responding to a report of a battery on Teakwood.[9] Officer Farr testified that when he responded to defendant's residence on Teakwood at around 2:30 a.m. for a report of battery, he was aware of a separate report of a stolen vehicle connected to that address. After Farr took defendant's statement, which was recorded on his body camera and played for the jury, Farr removed defendant's handcuffs and left.

Subsequently, Officer Avalos drove C.R. to defendant's residence on Teakwood for an in-field showup. Defendant, Kathy, and Ashley came outside, and C.R. described to Avalos the part each woman played in the events that night. C.R. stated that defendant struck her and beat her up. Officers Avalos and Jaime later followed up on an iPhone location signal to the residence on Burl, where Jaime located a cell phone in the front yard. Officer Farr arrested defendant and transported her to the police station, and her videorecorded interrogation was played for the jury.

Officer Avalos took two sets of photographs of C.R.'s injuries on October 21, first at her house at around 3:00 a.m. and then later that night at the police station. The photos show C.R. with a swollen, bloody lip; a bald spot on her head near the crown; locks of her hair hanging lower down her back; two black eyes; an abrasion on her chin; and bruising on her arms and shoulders. She also testified that the photos show swelling in her forehead and the bridge of her nose, and that she could not move her face due to the injuries. She testified that the "chunks" of hair hanging lower on her back had been pulled out by defendant during the drive to her house and when she pulled C.R. out of the car.

Officer Farr took photographs of defendant's injuries at her house when he first responded to her report of battery. He testified that she was holding a bag of ice to her

---

[9]    At the time of the events, Jonathan Farr was an officer with the Hanford Police Department. He was no longer a peace officer by the time of trial.

eye when he arrived at her house and the photographs show a small abrasion under her right eye.

## II. Defense Case

### A. Ashley's Testimony

Defendant's cousin, Ashley, was at defendant's house during the day and on the evening of October 20. Sometime after midnight on October 21, defendant's cousin, Caleb, arrived. Also present was defendant's cousin, Micah.[10] The four of them hung out in the backyard for approximately 15 or 20 minutes and Caleb then went inside. Defendant's mother, Kathy, came out. She told them Caleb had left and asked defendant to go get him because he did not know the area. Defendant left and Kathy went back inside.

Ashley and Micah were in the backyard for approximately 10 minutes when they heard a car horn continuously honking. They went through the house and out to the front with Kathy. Ashley saw defendant and C.R., whom she did not know, standing in the driveway and there was a smaller, dark car parked there. C.R.'s back was to Ashley and she was swinging at defendant, who was holding her away at arm's length by the shoulder.

Kathy yelled at them to stop, which they did, and said, "[W]hat the fuck[?]" Ashley asked defendant, "[W]hat the hell is going on[?]" Defendant responded, "[L]ook at my face, look at my face, they jumped us." Micah asked where Caleb was and defendant responded, "I don't know, I left." C.R. then told them, "I'll help you find Caleb, I'll help you find Caleb. They were at the wrong place at the wrong time." Defendant did not mention calling the police, and Ashley did not hear anyone say to call 911.

---

**10** Ashley testified she was not related to Caleb or Micah; they were defendant's cousins from the other side of defendant's family.

C.R. got into the smaller, dark car voluntarily, along with defendant, Kathy, and Micah, and Ashley went inside the house to get her car keys. She followed behind the other car, which Kathy drove, and called Madalynn from her car. She told Madalynn that Caleb and defendant had been jumped and asked if Caleb was there. After Madalynn said no, Ashley said they would be there in a few seconds and hung up.

When Ashley pulled up to Madalynn's house, everyone except for C.R. was standing outside with Madalynn and her husband, Richard, who had a bat with him. C.R. was sitting inside the smaller, dark car, and although defendant appeared to be very upset, she was not yelling at C.R., she was not standing near the car, and she did not approach the car and try to open the doors. Ashley entered the car through the unlocked front passenger door and checked the glove compartment for the registration information. C.R. was in the backseat on the driver's side, and Ashley asked her who she was and how old she was. C.R. gave her name and said she was 17 years old. Ashley asked her, "[W]hat the hell were you thinking[?]" but C.R. did not answer. Ashley testified that the car had been left running and no one prevented C.R. from getting out.

Ashley got back out of the car and told defendant that C.R. was only 17, and defendant shouted, "You want to hang out with thugs, you like to hang out with thugs[?]" A sports utility vehicle then pulled up and three young men and one older woman got out. One of the men, whom she later learned was Bryan, went to the driver's door of the smaller, dark car and C.R. then got out of the car. One of the other men approached defendant "aggressively," and defendant punched him. The third man asked where the car keys were and as he approached defendant, she also punched him.

The woman, whom Ashley recognized from seeing her one time at the grocery store, was talking to Madalynn. Madalynn seemed to know the woman, and when the woman first saw Madalynn, she had yelled at the three young men, "I know her, I know her." Defendant yelled to call the police and Ashley ran to the passenger door of the car as one of the men got in. She tried to hold the door open to prevent the man from driving

14.

off, but the three men left in the car. The older woman and C.R. then left in the woman's car.

Ashley, defendant, Micah, and Madalynn drove to Leland in Madalynn's car to look for Caleb. They heard a whistle while driving and found Caleb walking down the street. After picking Caleb up and returning to Madalynn's house, Ashley and defendant went back to defendant's house. Kathy arrived there at the same time, and Ashley asked defendant what happened. Defendant started to explain, but then she said she needed to go inside and get her cell phone to call the police. She also told Ashley she peed on herself, and Ashley could see defendant's pants were wet.

After changing clothes, defendant called the police from her garage and defendant, Ashley, and Kathy waited there until police arrived. Defendant started to explain what happened, but when defendant said she had jumped into the car, the officer cut her off and said, "You are admitting to me right now you stole their vehicle."

## B. Defendant's Testimony

### 1. Street Fight and Taking of Car

At the time of the events, defendant was 35 years old and she was employed as an acting nurse coordinator at a state hospital. She had just moved into her house on Teakwood and had a barbecue that day. Caleb and Micah came over after midnight, and she went into the backyard with them, along with Ashley. Caleb was intoxicated and about 20 minutes later, after he and Micah had words, he went inside, upset.

Defendant's mother, Kathy, came out and said that Caleb left. Kathy told defendant to go get him because he was living in Los Angeles and was not familiar with the area. Defendant, who left without her cell phone, caught up with Caleb, but was unable to convince him to return to her house, so she walked with him as he headed to Madalynn's house.

A car approached them from behind and pulled over on the other side of the road. It was around 1:20 a.m. and defendant did not recognize the car. She testified that Caleb

15.

had not done anything, but three unfriendly acting men got out of the car. The driver, Bryan, approached and said, "[Y]ou have something to say[?]" She replied "no" while Caleb just stood there. Bryan looked at Caleb and said, "[W]ell, he has something to say." Caleb responded "no" and Bryan asked why he flipped them off. Caleb said, "[I]f I flipped you off what are you going to do about it[?]" Bryan looked at Anthony, who nodded; turned back to Caleb; and said, "[W]ell, we have a problem because I say we have a problem." Bryan continued to approach, so "Caleb started talking shit to him," and asked "what the fuck" his problem was and what he was going to do.

Defendant grabbed Caleb and tried to direct him back onto the sidewalk, but he and Bryan continued walking toward one another and squared off. Bryan swung at Caleb three times and Caleb put him in a headlock. Defendant tried to diffuse the situation and get them to stop, but was unsuccessful. Anthony opened the car door and told someone else to get out. A woman then got out and stood to the side of the car trunk.

Defendant was standing between Bryan and Caleb, who were fighting, and Anthony and Dylan, who had gotten out of the car. Anthony and Dylan approached and said Caleb needed to let Bryan go. Defendant told them they were not going to jump her cousin and if they wanted to fight, it was going to be a fair fight, one on one. She also told them they had wanted this, and she had tried to convince them not to do it. She denied she egged the fight on or told Caleb to kill Bryan.

Anthony ran around her to Caleb while Dylan ran to the trunk of the car and tried to open it. Defendant panicked, ran toward the trunk, and pushed Dylan away. She stood there for a minute and then walked toward the car before turning around to walk away again. Anthony asked where she thought she was going and she responded, "[Y]eah, they are fighting." She turned around and was at the driver's door. The car doors were open, and the engine was running. Defendant testified she jumped in the car because she feared for her life and thought there was a gun in the trunk of the car. She did not have

16.

her cell phone with her, and she did not try to run because she was heavier and not as fit as C.R., Anthony, and Dylan.

As defendant went to put the car in drive, C.R., who was on her knees in the front passenger seat, punched defendant in the side of the head. Anthony then punched her in the head from the driver's side and Dylan punched her from behind. Defendant testified she was hit more than 20 times and she peed on herself. She pressed down on the gas pedal and the car fishtailed. C.R. kept hitting her, so she grabbed C.R.'s hair, held C.R. at arm's length to keep C.R. from hitting her, put the car in drive, and took off, which caused the car doors to shut.

### 2. Events on Teakwood

C.R. continuously punched defendant, and kept calling defendant a bitch, telling defendant to let go of her hair, and saying she was "going to fuck [defendant] up." Defendant testified that all she could do was pull C.R.'s hair to keep C.R. back, and she let go of C.R.'s hair three times as she turned street corners. C.R. was demanding to know where they were going, and defendant told her they were going to defendant's house and she was going to call the police. C.R. said, "I'm going to fuck you up, bitch."

As defendant pulled into her driveway, she honked the horn continuously. Defendant let go of C.R.'s hair to park the car and C.R. continued to punch her, so she grabbed C.R.'s hair again and pulled her out of the car through the driver's side door. After they were out of the car, C.R. punched defendant again and defendant punched her back. Defendant's family came out and her mother, Kathy, said, "[W]hat the fuck is going on[?]" and "[S]top." They stopped and Ashley asked her what was going on. Defendant told them she did not know who C.R. was and did not know whose car it was.

Micah asked where Caleb was and defendant said she left him at Leland and 10th, where he was getting jumped. Defendant testified she felt horrible that she left Caleb and when C.R. offered to help get Caleb back, she feared the worst. C.R. told her "that [she] was at the wrong place at the wrong time and that they wanted to do this." Micah

17.

"started freaking out" and wanted to go get Caleb so they got back in the car. Her mother drove, and she and Micah sat in the backseat with C.R. between them. They first went to Leland and 10th, but no one was there anymore so she told her mother to drive to Madalynn's house.

### 3. Events on Burl

After they arrived at Madalynn's house, they got out of the car, which was left running. C.R. stayed inside in the backseat. Defendant denied threatening C.R. or punching her, and said C.R. kept repeating they were just in the wrong place at the wrong time, and she would help them get Caleb back. Defendant told C.R. she was going to get herself killed hanging out with people like that. Defendant described herself as frantic, and said she was pacing the lawn.

Ashley got in the front passenger seat and defendant saw her hands moving at the glove compartment. Afterward, Ashley told defendant that C.R. was only 17 years old. Defendant yelled toward the car, "[Y]ou dumb bitch, what, do you like hanging out[] with thugs[?]"

Madalynn had also walked to the car and talked to C.R., although defendant could not hear what was said. Defendant then saw Madalynn holding a phone and she could hear a man on the other end. Madalynn asked where Caleb was, and the man responded they had Caleb and wanted their car and cell phones back or they would kill Caleb. When the call ended and Madalynn approached defendant, defendant told her to call 911, but she did not do so. Defendant sat down on the porch to think and then, since the man mentioned wanting their cell phones back, she went to the car to look for a phone. She saw a cell phone on the floorboard on the front passenger side and grabbed it. Defendant told C.R. she was going to jail because defendant was going to call the police, but when defendant shut the car door and pressed on the phone, it was dead, so she threw it in the front yard and sat back down on the porch.

18.

A four-door sedan then pulled up and the three men from earlier and a woman she did not recognize got out. Bryan walked toward the car where C.R. was, and as she got up from the porch and walked toward Madalynn and Richard, Anthony and Dylan approached "aggressively." Anthony had his fists clenched and defendant punched him in the face. Dylan then approached aggressively and asked, "[W]here's the keys, bitch," and she punched him, too. Defendant said to Dylan, "[Y]ou don't think I remember that you were beating me[?]" Anthony called her "a stupid bitch," and she said to "stop the car and call the police," but the three of them got in the car and left. By then, C.R. was inside the other car the group arrived in, and she and the woman also left.

Defendant told Madalynn to take her home so she could call the police, and she, Madalynn, Ashley, and Micah headed for her house in Madalynn's car. They had the windows rolled down and heard whistling. They turned down the street they thought it came from and saw Caleb. Madalynn then took defendant and Ashley back to defendant's house.

### 4. Statements to Police

Ashley asked defendant what happened, and she started to explain, but then said she needed to call the police. She went to her room, changed her urine-soaked pants, retrieved her cell phone, and called police to report a crime. Defendant waited with her mother and Ashley in her garage with the door open. Police arrived a few minutes later and she tried to tell Officer Farr what happened, but he kept cutting her off. After he accused her of stealing a car, she did not feel comfortable talking to him and began lying. She told Farr that she stopped just around the corner from where the fight was, asked C.R. what was going on, C.R. made a phone call, and the group showed up. She asked where Caleb was, they said they did not know, and she walked home.

Farr later came back to arrest defendant and take her to the police station. During interrogation, defendant initially said again that she pulled the car over, asked C.R. what was going on, and told her "to call [her] peeps" "to come get the car." Defendant walked

home after the group showed up, told her they had Caleb, and left. Officers accused defendant of lying to them and pointed out she left out going to her house on Teakwood and then going to Burl. She stated, "You're right I did," and when asked why she was lying, she said, "Because I don't know what the fuck's going on."

Defendant told the jury she was never able to tell officers what happened from start to finish, but she answered their questions and by the end, she was answering them truthfully. On cross-examination, defendant admitted she lied more than once, including when she described the route she took and when she told them she stopped the car to let C.R. out. Defendant told police that she told Caleb to call 911. Caleb said no and handed her his phone, but it was locked. When she handed it back and told him to unlock it, Bryan was approaching and Caleb put the phone in his pocket. She said the phone was different than hers and denied knowing one can call 911 from a locked phone.

### 5. Photographs

Defendant testified that the photographs taken by Officer Farr on October 21 show her right eye was swollen and starting to turn black, she had a scratch under her right eye, and she had bumps on her forehead and temple. Family members also took photographs on October 23 at two different times showing her blackened right eye and facial swelling around her temple. Defendant testified that her black eye was caused by C.R. punching her.

## DISCUSSION

## I. Instructional Error Claims

### A. Modified CALCRIM No. 225

#### 1. Background

Defendant was charged with kidnapping by force or fear, child abuse, assault, and false imprisonment. As to kidnapping and false imprisonment, the jury was instructed on the defense of legal necessity and as to child abuse and assault, the jury was instructed on self-defense or the defense of others. The trial court instructed the jury on circumstantial

20.

evidence with CALCRIM No. 225 (Circumstantial Evidence:  Intent or Mental State), as follows:

> "The People must prove not only that the defendant did the act charged, but also that she acted with a particular intent or mental state.  The instructions for each crime explains the intent or mental state required.  An intent or mental state may be proved by circumstantial evidence.
>
> "Before you may rely on circumstantial evidence to conclude a fact necessary to find a defendant guilty has been proved you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.
>
> "Also, before you may rely on circumstantial evidence to conclude that the defendant had the required intent or mental state you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required mental state or intent.  If you can draw two or more reasonable conclusions from the circumstantial evidence and one of those reasonable conclusions supports a finding that the defendant *did* have the required mental state and the other reasonable conclusion supports a finding that the defendant *did not* you must conclude that the required intent or mental state was *not proved* by the circumstantial evidence.  However, when considering circumstantial evidence you must accept only the reasonable conclusions and reject any that are unreasonable."  (Italics added.)

Subsequently, and just before instructing the jury on the defenses of legal necessity and self-defense or defense of others, the trial court instructed the jury with a modified version of CALCRIM No. 225, as follows:

> "All right.  Counsel and members of the Jury, the reason I'm pausing is I read to you an instruction which has the [CALCRIM] number 225 regarding circumstantial evidence to a mental state or intent.  Now, those apply to the requirements that are in the People's case in chief.  In other words, the charges being brought by the People, in each of those counts and those instructions that I just gave you is what they need to prove.
>
> "What I'm about to go into now are what are commonly referred to as defenses.  *I'm going to read you an instruction on defense and necessity and instructions on self defense*.

21.

"In [CALCRIM No.] 225 you need to consider modifying now what you consider to be defenses. So when I initially told you you can draw two or more reasonable conclusions from the circumstantial evidence and one of those reasonable conclusions supports a finding the defendant did have the required intent or mental state and another reasonable conclusion supports a finding that the defendant did not you must conclude the required intent or mental state was not proved by the circumstantial evidence. Because we're now on the defense part of it you simply need to flip that around so that if there are two reasonable conclusions, one that points to that defendant's, *in the case of the defenses*, *had* the required intent or mental state in that and another reasonable conclusion that it *did not*, you must accept the one that shows that she *did*. But you can only accept, as with the instructions, only reasonable. Again, when considering the circumstantial evidence you must accept only the reasonable conclusions and reject any that are unreasonable.

"And what I'll do is when we take the next break I'll actually write out that paragraph again for application to these defenses so that it's clear." (Italics added.)[11]

There were no objections to any of the jury instructions and both parties expressly stated they understood why the court gave a modified version of CALCRIM No. 225 with respect to legal necessity and self-defense or the defense of others. During a break, the court drafted the modified instruction and then instructed the jury as follows, just before the parties began their closing arguments:

"Let's pass out the instruction I've labeled [CALCRIM No.] 225A.

"All of the jurors have that instruction. Let me read it to you.

"*As to the defense necessity and self defense an intent or mental state may be proved by circumstantial evidence*.

"If you can draw two or more reasonable conclusions from the circumstantial evidence and one of those reasonable conclusions supports a finding that the defendant *did* have the required intent or mental state and another reasonable conclusion supports a finding that the defendant *did not* you must conclude that the required intent or mental state *was proved* by the circumstantial evidence. However, when considering circumstantial

---

[11] Identified in the record as CALCRIM No. 225a.

22.

evidence you must accept only reasonable conclusions and reject any that are unreasonable." (Italics added.)

On appeal, defendant claims that the trial court's modified instruction imposed a mandatory conclusive presumption that she had the required intent or mental state as to *the charges* against her, in violation of her constitutional rights, and that the error was not harmless beyond a reasonable doubt under *Chapman*. If we find the claim forfeited for failure to object, defendant claims trial counsel rendered ineffective assistance of counsel because there was no valid tactical reason for agreeing to the instruction. As discussed next, we disagree with defendant's characterization of the modified instruction as violating her constitutional rights. We conclude that, assuming the instruction might be appropriate in some cases, it should not have been given in this case, where defendant's testimony supplied direct evidence of her intent or mental state as related to her defenses. However, the error was not prejudicial.

### 2.    Forfeiture

The People claim defendant's failure to object to the modified instruction forfeits her claim on review. It is well established that, "as a general matter, '"'a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.'"'" (*People v. Johnson* (2016) 62 Cal.4th 600, 638.) "[H]owever, … an appellate court may review any instruction, even when there was no objection or request for modification below, 'if the substantial rights of the defendant were affected thereby.'" (*Ibid.*, quoting § 1259.) Because it appears the instruction should not have been given in this case, we elect to reach the merits of defendant's claim, without determining whether or not the asserted error affected her substantial rights.

23.

### 3. Analysis

#### a. Standard of Review

We review a claim of instructional error de novo. (*People v. Waidla* (2000) 22 Cal.4th 690, 733; *People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.) "In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*People v. Martinez* (2010) 47 Cal.4th 911, 953.) "[I]nstructions are not considered in isolation. Whether instructions are correct and adequate is determined by consideration of the entire charge to the jury." (*People v. Holt* (1997) 15 Cal.4th 619, 677; accord, *People v. Thomas* (2011) 52 Cal.4th 336, 356.) Jurors are presumed to have understood and followed the trial court's jury instructions. (*People v. Sandoval* (2015) 62 Cal.4th 394, 422.)

Error under state law is reviewed under the standard set forth in *Watson*, which requires a determination "whether there is a 'reasonable probability' that a result more favorable to the defendant would have occurred absent the error." (*People v. Aranda* (2012) 55 Cal.4th 342, 354, quoting *Watson, supra*, 46 Cal.2d at p. 837.) Error rising to the level of a federal constitutional violation is reviewed under the standard articulated in *Chapman*, which requires a determination "whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*People v. Merritt* (2017) 2 Cal.5th 819, 831, citing *Neder v. United States* (1999) 527 U.S. 1, 18; accord, *People v. Gonzalez* (2012) 54 Cal.4th 643, 663.) "[I]n order to conclude that an instructional error "'did not contribute to the verdict'" within the meaning of *Chapman* [citation] we must "'find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record'" [citations]." (*People v. Brooks* (2017) 3 Cal.5th 1, 70.)

## b. Constitutional Challenge

Defendant does not expressly claim that a modified version of CALCRIM No. 225 given as to defenses misstates the law or should not be given as a more general matter. Rather, citing *Carella v. California* (1989) 491 U.S. 263, 265 and *Estelle v. McGuire* (1991) 502 U.S. 62, 72, defendant casts the alleged error as one of constitutional magnitude because the instruction imposed a mandatory conclusive presumption that she had the required intent or mental state as to *the charges*, in violation of her right to due process. Although an erroneous jury instruction may "'so infuse[] the trial with unfairness as to deny due process of law'" (*Estelle v. McGuire, supra*, at p. 75; accord, *People v. Lemcke* (2021) 11 Cal.5th 644, 655), "'the category of infractions that violate "fundamental fairness" [has been defined] very narrowly'" (*Estelle v. McGuire, supra*, at p. 73). Jury instructions that relieve the state of its burden of proving every element of a charged offense beyond a reasonable doubt violate due process (*Carella v. California, supra*, at p. 265; accord, *People v. Flood* (1998) 18 Cal.4th 470, 491), but CALCRIM Nos. 224 and 225 "clarify the application of the general doctrine requiring proof beyond a reasonable doubt to a case in which the defendant's guilt must be inferred from a pattern of incriminating circumstances" (*People v. Gould* (1960) 54 Cal.2d 621, 629, overruled on another ground by *People v. Cuevas* (1995) 12 Cal.4th 252, 257; accord, *People v. Wright* (2021) 12 Cal.5th 419, 451 (*Wright*)). The California Supreme Court has repeatedly rejected the claim that CALCRIM Nos. 224 and 225 "reduce or weaken the prosecution's constitutionally mandated burden of proof or amount to an improper mandatory presumption of guilt." (*People v. Kipp* (1998) 18 Cal.4th 349, 375 [CALJIC Nos. 2.01 & 2.02]; accord, *People v. Armstrong* (2019) 6 Cal.5th 735, 792–794; *People v. Ghobrial* (2018) 5 Cal.5th 250, 286.)

Given this settled law, defendant fails to explain how the mirror-image instruction, merely modified to address circumstantial evidence of intent or mental state as it concerned *the defenses*, created a mandatory presumption of intent or mental state with

25.

respect to *the charges* or undermined the prosecution's burden of proof. Moreover, the record does not support defendant's claim that the modified instruction would have confused or misled the jury with respect to its evaluation of the prosecutor's burden of proof or her guilt. To the extent the instruction was permissible as a general matter, the trial court was very clear that the modified instruction was relevant to evaluation of the defenses. Therefore, we reject defendant's claim of constitutional error and turn to the issue of error under state law.

### c.      Error Under State Law

"A trial court must instruct the jury regarding how to evaluate circumstantial evidence "'sua sponte when the prosecution *substantially* relies on circumstantial evidence to prove guilt.'"" (*People v. Contreras* (2010) 184 Cal.App.4th 587, 591, italics added, quoting *People v. Rogers* (2006) 39 Cal.4th 826, 885; accord, *Wright, supra*, 12 Cal.5th at p. 451 [CALJIC No. 2.01].) CALCRIM No. 225, rather than the more general CALCRIM No. 224, should be given "'when the defendant's specific intent or mental state is the only element of the offense that rests substantially or entirely on circumstantial evidence.'" (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1171–1172, quoting *People v. Honig* (1996) 48 Cal.App.4th 289, 341; accord, *Wright, supra*, at pp. 450–451 [CALJIC No. 2.02]; see *People v. Contreras, supra*, at p. 591, fn. 4, citing *People v. Samaniego, supra*, at p. 1171, fn. 12 ["CALCRIM No. 224 corresponds to CALJIC No. 2.01 and CALCRIM No. 225 corresponds to CALJIC No. 2.02. Case law addressing CALJIC instructions is still generally applicable to the corresponding CALCRIM instruction."].) However, neither instruction "'should … be given where the evidence is either direct or, if circumstantial, is not equally consistent with a conclusion of innocence.'" (*Wright, supra*, at p. 451; accord, *People v. Anderson* (2001) 25 Cal.4th 543, 582.) Instruction "'is appropriate only when "guilt must be inferred from a pattern of incriminating circumstances."'" (*Wright, supra*, at p. 451.)

With respect to the defenses in this case, defendant's testimony supplied direct evidence of her intent and mental state. As previously stated, defendant does not claim the modified instruction misstated the law as a general matter, and she does not claim the instruction should not have been given at all or that it should have been given but modified differently. We need not decide whether a modified instruction applicable to defenses is appropriate in some cases, because, assuming so, it appears it should not have been given in this case, where the evidence of defendant's intent or mental state relevant to her defenses was direct. (*Wright, supra*, 12 Cal.5th at p. 451.) We note that defendant does not raise the argument that the standard CALCRIM No. 225 instruction was also misplaced in this case and, therefore, we do not consider that issue. However, assuming neither instruction was appropriate in light of the direct evidence in this case, there was no prejudice to defendant, as discussed next.

### d. Error Harmless

We find no reasonable probability of a result more favorable to defendant had the trial court omitted modified CALCRIM No. 225 from its instruction to the jury. As explained, defendant's claim that the instruction weakened the prosecutor's burden of proof, created a mandatory presumption of guilt, or otherwise confused the jury with respect to burden of proof or guilt is not supported by the record. We also find no basis for a claim that the modified instruction confused or misled the jury to defendant's detriment with respect to her defenses of legal necessity or self-defense or defense of others.

The defense of necessity applied if "'defendant violated the law (1) to prevent a significant evil, (2) with no adequate alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief in the necessity, (5) with such belief being objectively reasonable, and (6) under circumstances in which [s]he did not substantially contribute to the emergency.'" (*People v. Trujeque* (2015) 61 Cal.4th 227, 273.) Self-defense or the defense of others applied if "'one, the defendant reasonably

27.

believed that [she or Caleb] was in imminent danger of suffering bodily injury … or was in imminent danger of being touched unlawfully; two, the defendant reasonably believed that the immediate use of force was necessary to defend against that danger; and three, the defendant used no more force than was reasonably necessary to defend … against that danger.'" (*People v. Clark* (2011) 201 Cal.App.4th 235, 250, quoting CALCRIM No. 3470.) "'Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury.'" (*People v. Lopez* (2011) 199 Cal.App.4th 1297, 1305–1306, quoting *In re Christian S.* (1994) 7 Cal.4th 768, 783.)

The basic underlying facts in this case are undisputed. Defendant drove away from the scene of the street fight in a car that did not belong to her with C.R. in the passenger seat, held by the hair. After first going to her house and pulling C.R. out of the car, defendant and a family member put C.R. in the backseat between them and defendant's mother drove them to defendant's cousin's house.

At trial, defendant claimed that after Dylan tried to open the trunk, she jumped in the car and drove off because she thought there was or might be a weapon in the trunk and she feared for her life. However, there is no evidence anyone was armed, no evidence there were any weapons in the trunk, and no evidence anyone threatened to use a weapon. Although the cell phone video was not particularly clear, nothing on video suggests anyone opened or tried to open the trunk, and seconds before jumping in the car, defendant stated, in a calm, steady voice, "Yeah, they're fighting."

C.R. testified that a neighbor from an apartment complex on the street inquired about what was going on and defendant's response is consistent with that question. Although defendant testified that Anthony asked her where she was going, her response is not consistent with that question, particularly coming from another participant in the events. Notably, defendant did not call out for help or try to run for help during the street fight. She testified she could not outrun C.R., Dylan, Anthony and Bryan, but she was

28.

not being attacked or threatened by anyone prior to getting in the car; instead, everyone's focus was the fistfight between Caleb and Bryan until defendant jumped in the car. Inexplicably, defendant left Caleb behind with three young men she contended were hostile and once she arrived at her house, she pulled C.R. out of the car through the driver's door by the hair and told her family they had been jumped. Defendant did not run inside her house and call police, and she did not tell her family anyone's life was in danger or to call police.

Even setting aside the credibility issues defendant created by lying to the police at her house and at the police station, this was a strong case for the prosecution and defendant's claim of fear for her life was substantially undermined by her own actions. On the facts of this case, we find any error in instructing the jury with a modified version of CALCRIM No. 225 as to defenses was harmless under either standard of review. Furthermore, even if we assume it was also error to instruct with the standard CALCRIM No. 225 instruction, this finding remains the same.

### B. CALCRIM No. 875

#### 1. Background

Next, the trial court instructed the jury pursuant to CALCRIM No. 875 (Assault with Force Likely to Produce GBI) as follows, with the error italicized:

> "The defendant is charged in Count 3 with assault with force likely to cause [GBI], in violation of Penal Code Section 245[, subdivision ](a)(4).

> "To prove that the defendant is guilty of this crime the People must prove that: The defendant did an act that by its nature would directly and probably result in the application of force to a person *or* the force used was likely to produce [GBI]. Two, the defendant did that act willfully. Three, the defendant—when the defendant acted she was aware of facts that would lead a reasonable person to realize that her act by its nature would directly and probably result in the application of force. Four, when the defendant acted she had the present ability to apply force likely to produce [GBI] to a person. And, five, the defendant did not act in self defense or in defense of someone else.

*"Now, ladies and gentlemen, on that [CALCRIM No.] 875 instruction, between 1A and 1B, where it says 'and' you'll notice I used the word 'or'. So strike out 'and' and put 'or' so it would be either 1A or 1B.*

"Someone commits an act willfully when she does it willingly or on purpose. It is not required that she intend to break the law or hurt someone else or gain any advantage.

"The People are not required to prove that the defendant actually intended to use force against someone when she acted. No one needs to actually have been injured by the defendant's act, but if someone was injured you may consider that fact, along with all the other evidence in deciding whether the defendant committed an assault and, if so, what kind of assault it was.

"[GBI] means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm." (Italics added.)

There is no dispute between the parties that the trial court should have instructed the jury that the People must prove "[t]he defendant did an act that by its nature would directly and probably result in the application of force to a person, *and* [¶] [t]he force used was likely to produce [GBI]." (CALCRIM No. 875.) However, they disagree whether the error was prejudicial. The People also contend that defendant's failure to object in the trial court forfeits the claim. Because the trial court misinstructed the jury on an element of the offense, the claim is not forfeited (*People v. Nelson* (2016) 1 Cal.5th 513, 543; *People v. Mil* (2012) 53 Cal.4th 400, 409), but we find the error harmless on this record.

### 2. Error Harmless

"'The trial court has a sua sponte duty to instruct the jury on the essential elements of the charged offense.' (*People v. Merritt*[*, supra*,] 2 Cal.5th [at p.] 824.) Failure to do so is a 'very serious constitutional error because it threatens the right to a jury trial that both the United States and California Constitutions guarantee. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 16.) All criminal defendants have the right to "a jury determination that the defendant is guilty of every element of the crime with which he is charged,

beyond a reasonable doubt.'" (*Ibid.*) The error is reversible unless 'it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error.'" (*People v. Rivera* (2019) 7 Cal.5th 306, 332–333; accord, *People v. Serrano* (2022) 77 Cal.App.5th 902, 908–909.)

Defendant claims that the erroneous instruction allowed the jury to convict her if it merely found she did an act that by its nature directly and probably would result in the application of force to a person, and the instruction did not require the jury to find the prosecutor prove the force used was likely to produce GBI. Defendant acknowledges that in convicting defendant of child abuse in count 2, the jury found she inflicted pain or suffering … under circumstances or conditions likely to produce GBI, and that for both child abuse and assault, the jury was instructed with same definition of GBI. However, she argues that the error was not harmless because "the finding that [she] had the present ability to apply force likely to produce [GBI] does not demonstrate she actually used such force," and "[t]here is a reasonable likelihood that for the child abuse charge, the jury determined that the probable harm arose from [C.R.] feeling like she had to escape by jumping out [of] the moving car, rather than from any actual force [defendant] used."

This case unquestionably involved the use of physical force by defendant against C.R. Defendant's assertion that the prosecutor's theory on the child abuse count relied on the harm arising from C.R.'s perceived need to jump out of the car rather than from actual force is contradicted by the record. Contrary to defendant's argument, the prosecutor detailed the physical injuries suffered by C.R.; emphasized the difference in size between C.R., who said she was then five feet tall and weighed around 100 pounds, and defendant, whom Officer Farr testified was 5 feet 7 inches tall and weighed 180 pounds; and concluded, "[Y]ou have multiple injuries to pick from. The defendant is guilty of child abuse." The prosecutor's comment regarding C.R.'s attempted escape from the car, cited by defendant to support her argument, was made in the context of the argument that for the assault count, in addition to being punched repeatedly, C.R. tried to

31.

get away, but defendant held her by the hair continuously and with sufficient force to pull out a chunk of hair.

In light of the jury's finding on the child abuse count that "defendant inflicted pain or suffering … under circumstances or conditions likely to produce great bodily harm," defendant's uncontroverted use of force against C.R. in this case, and the fact that the prosecutor's theory of liability for both child abuse and assault was defendant's use of physical force, we find the instructional error harmless. "'[I]t is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error.'" (*People v. Rivera, supra*, 7 Cal.5th at p. 333, quoting *People v. Merritt, supra*, 2 Cal.5th at p. 831.)

## II.    Section 654

### A.    Background

Finally, the probation report recommended that the court stay defendant's sentence on count 3 for assault, pursuant to section 654. During the sentencing hearing, the prosecutor argued that section 654 did not apply because defendant had the opportunity to stop and reflect during the course of conduct, while defendant argued that all three counts were part of a continuing course of action and, therefore, subject to section 654. Although the court did not explain its reasoning, it did not apply section 654 to any of the counts.

Defendant now challenges the trial court's decision not to stay either count 2 or count 3 under section 654. Relying on *Mejia*, defendant argues on appeal that either count 2 for child abuse or count 3 for assault should have been stayed under section 654. (*People v. Mejia* (2017) 9 Cal.App.5th 1036 (*Mejia*).) The People contend that section 654 does not apply because this case involves separate acts of gratuitous violence (*People v. Nguyen* (1988) 204 Cal.App.3d 181 (*Nguyen*), and defendant harbored separate intents. For the reasons set forth below, we conclude that substantial evidence supports the trial court's implied finding of a divisible course of conduct sufficient to

support imposition of punishment as to two of the counts, but not all three. (*People v. Fuentes, supra*, 78 Cal.App.5th at p. 680.) Therefore, we remand this matter to the trial court to stay one of the sentences under section 654.

## B. Standard of Review

As amended by Assembly Bill No. 518 (2021–2022 Reg. Sess.) (Assembly Bill 518), effective January 1, 2022, section 654, subdivision (a), provides, "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision…." The statute "expressly prohibits separate punishment for two crimes based on the same act, but has been interpreted to also preclude multiple punishment for two or more crimes occurring within the same course of conduct pursuant to a single intent." (*People v. Vargas* (2014) 59 Cal.4th 635, 642; accord, *People v. Harrison* (1989) 48 Cal.3d 321, 335 (*Harrison*).) Determining "[w]hether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry .…" (*People v. Corpening* (2016) 2 Cal.5th 307, 311 (*Corpening*).) "We first consider if the different crimes were completed by a 'single physical act.' [Citation.] If so, the defendant may not be punished more than once for that act. Only if we conclude that the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of conduct reflects a single '"intent and objective"' or multiple intents and objectives." (*Ibid.*)

We review the trial court's express or implied factual findings for substantial evidence, and its conclusions of law de novo. (*People v. Brents* (2012) 53 Cal.4th 599, 618; *People v. Perez* (1979) 23 Cal.3d 545, 552 & fn. 5; *People v. Moseley* (2008) 164 Cal.App.4th 1598, 1603.) We "affirm the trial court's ruling, if it is supported by substantial evidence, on any valid ground" (*People v. Capistrano* (2014) 59 Cal.4th 830, 886, fn. 14, overruled in part on another ground in *People v. Hardy* (2018) 5 Cal.5th 56, 103–104; accord, *People v. Brents, supra*, at p. 618), and where there is no "explicit

ruling by the trial court at sentencing, we infer that the court made the finding appropriate to the sentence it imposed, i.e., either applying section 654 or not applying it" (*Mejia, supra*, 9 Cal.App.5th at p. 1045, citing *People v. Tarris* (2009) 180 Cal.App.4th 612, 626–627).

### C. Analysis

#### 1. *Mejia* Decision

In *Mejia*, discussed by defendant, the defendant was convicted of torture, spousal rape, spousal abuse, and criminal threats, and the trial court imposed unstayed sentences for all four crimes. (*Mejia, supra*, 9 Cal.App.5th at p. 1039.) However, the torture charge was based on a continuous course of conduct that involved the same assaultive acts underlying the spousal rape and spousal abuse charges (*id.* at pp. 1043–1044), and was described by the prosecutor as "'an umbrella'" charge (*id.* at p. 1044). On review, the appellate court explained that torture "requires the intentional commission of one or more assaultive acts, such as infliction of corporal injury on a spouse, committed with the intent to cause cruel or extreme pain and suffering. Accordingly, although a defendant may be convicted of both torture and of any or all of the underlying acts [citation], section 654 precludes imposition of unstayed sentences for both torture and any of the underlying assaultive offenses upon which the prosecution relies to prove that element." (*Id.* at pp. 1044–1045.) The court pointed out the result would be different "if the record supported the conclusion that any one of either type of crime was committed outside of the torture course of conduct." (*Id.* at p. 1045.) However, "because the prosecution relied upon each act of spousal rape and each act of infliction of corporal injury on a spouse as the intentional acts underlying the torture conviction, it is irrelevant whether [the] defendant harbored a single objective or multiple objectives." (*Ibid.*)

*Mejia* drew on *Mesa*, in which the California Supreme Court concluded that section 654 prohibited the defendant from being punished both for active gang participation and for assault with a firearm and possession of a firearm by a felon, for

guidance. (*Mejia, supra*, 9 Cal.App.5th at p. 1044, citing *People v. Mesa* (2012) 54 Cal.4th 191, 197–198 (*Mesa*).) *Mesa* reasoned that "for each shooting incident, [the] defendant's sentence for the gang crime violates section 654 because it punishes [the] defendant a second time either for the assault with a firearm or for possession of a firearm by a felon." (*Id.* at p. 197.) Subsequently, in *Corpening*, the court recognized that while crimes completed by a single physical act may not be punished more than once, "[p]recisely how to resolve whether multiple convictions are indeed based on a single physical act has often left courts with more questions than answers. [Citation.] Neither the text nor structure of section 654 resolves when exactly a single act begins or ends, for example, or how to take account of the fact that virtually any given physical action may, in principle, be divided into multiple subsets that each fit the colloquial definition of an 'act.'" (*Corpening, supra*, 2 Cal.5th at p. 312.)

The court then explained that its decisions in *People v. Jones* (2012) 54 Cal.4th 350 and *Mesa* "reflect a common idea: Whether a defendant will be found to have committed a single physical act for purposes of section 654 depends on whether some action the defendant is charged with having taken separately completes the actus reus for each of the relevant criminal offenses." (*Corpening, supra*, 2 Cal.5th at p. 313.)

In contrast with the course of conduct in *Mejia* giving rise to the torture charge, this case does not involve a charge that relies on the commission of the other charges as an element. That is, this case does not involve a single physical act within the meaning of section 654 (*Corpening, supra*, 2 Cal.5th at pp. 313–314), but instead turns on the divisibility of the course of conduct.

### 2. Divisibility of Course of Conduct

Generally, ""'[w]hether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.'"""

(*People v. Capistrano, supra*, 59 Cal.4th at p. 885, quoting *People v. Rodriguez* (2009) 47 Cal.4th 501, 507.) However, "'[b]ecause of the many differing circumstances wherein criminal conduct involving multiple violations may be deemed to arise out of an "act or omission," there can be no universal construction which directs the proper application of section 654 in every instance.'" (*People v. Hicks* (2017) 17 Cal.App.5th 496, 514, quoting *Beamon, supra*, 8 Cal.3d at p. 636; accord, *Harrison, supra*, 48 Cal.3d at p. 336.) Section 654 "is intended to ensure that [the] defendant is punished 'commensurate with his culpability'" (*Harrison, supra*, at p. 335), and "a 'broad and amorphous' view of the single 'intent' or 'objective' needed to trigger the statute would impermissibly 'reward the defendant who has the greater criminal ambition with a lesser punishment'" (*id.* at pp. 335–336, quoting *People v. Perez, supra*, 23 Cal.3d at pp. 552–553).

"'If [the defendant] entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.'" (*People v. Porter* (1987) 194 Cal.App.3d 34, 38, quoting *Beamon, supra*, 8 Cal.3d at p. 639; accord, *Harrison, supra*, 48 Cal.3d at p. 335; *People v. Tom* (2018) 22 Cal.App.5th 250, 260.) "Whether the defendant maintained multiple criminal objectives is determined from all the circumstances and is primarily a question of fact for the trial court, whose finding will be upheld on appeal if there is any substantial evidence to support it." (*People v. Porter, supra*, at p. 38, citing *People v. Goodall* (1982) 131 Cal.App.3d 129, 148; accord, *People v. Tom, supra*, at p. 260.)

"Furthermore, [and relevant in this case,] 'multiple crimes are not one transaction where the defendant had a chance to reflect between offenses and each offense created a new risk of harm.'" (*People v. Lopez* (2011) 198 Cal.App.4th 698, 717, quoting *People v. Felix* (2001) 92 Cal.App.4th 905, 915.) "Under section 654, a course of conduct divisible in time, though directed to one objective, may give rise to multiple convictions

and multiple punishment 'where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken.'" (*People v. Lopez, supra*, at pp. 717–718, quoting *People v. Gaio* (2000) 81 Cal.App.4th 919, 935; accord, *People v. Fuentes, supra*, 78 Cal.App.5th at p. 680; *People v. Roles* (2020) 44 Cal.App.5th 935, 946; *People v. Gaynor* (2019) 42 Cal.App.5th 794, 803–804.)

### 3.       Section 654 Bars Punishment for Both Child Abuse and Assault

After defendant and C.R. entered the car at the scene of the street fight, defendant punched C.R. and then gripped her hair so tightly during the drive that C.R. could not look up or escape the car. Immediately upon arrival at defendant's house, she yanked C.R. out of the car from the front passenger seat through the driver's side door by her hair and began punching her. Subsequently, on the drive from defendant's house to Madalynn's house, defendant repeatedly hit C.R., who was on her knees on the floor of the backseat, in the head, neck, and back. These facts support a finding that defendant had the opportunity to reflect and renew her criminal intent between arriving at her house and leaving for Madalynn's house and, therefore, substantial evidence supports the trial court's implied finding of divisibility between these two events for the purpose of sentencing defendant for kidnapping and either child abuse or assault (*People v. Fuentes, supra*, 78 Cal.App.5th at p. 680; *People v. Gaynor, supra*, 42 Cal.App.5th at p. 804), an outcome that is consistent with the intent of section 654 to ensure that the punishment is commensurate with culpability (*People v. Capistrano, supra*, 59 Cal.4th at p. 886).

The People defend the imposition of sentences for both child abuse and assault on the ground that defendant had multiple intents or objectives, but they do not identify what those were, cite to evidence in the record in support of their argument, or otherwise develop the argument. A finding of independent criminal objectives is a question of fact and must be supported by "evidence which is reasonable, credible, and of solid value."

37.

(*People v. Kelly* (2018) 28 Cal.App.5th 886, 903, citing *People v. Armstrong* (2016) 1 Cal.5th 432, 450.) The record here does not support a finding that defendant had independent criminal objectives such that multiple sentences for both child abuse and assault was permissible under section 654.

Relying on *Nguyen*, the People also argue that defendant's use of physical force against C.R. was so "gratuitous" as to support multiple sentences. (*Nguyen, supra*, 204 Cal.App.3d at p. 190.) In *Nguyen*, the robbery victim was shot after he had been relieved of his valuables, and the appellate court found the trial court's implied finding of divisibility was supported by substantial evidence. (*Ibid.*) The court reasoned that the shooting "constituted an example of gratuitous violence against a helpless and unresisting victim which has traditionally been viewed as not 'incidental' to robbery for purposes of … section 654." (*Ibid.*)

The force used against C.R. during the drive to Teakwood facilitated the kidnapping. However, once defendant arrived at her house, she had an opportunity to reflect prior to departing for the house on Burl. This break in events permits the course of conduct to be divided for the purpose of punishing defendant for either child abuse or assault, in addition to kidnapping. This result is consistent with the reasoning of *Nguyen*, but we disagree with the People that the decision can also be read to support imposition of punishment for kidnapping, child abuse, *and* assault. The child abuse and assault counts are based on the same underlying conduct and under section 654, defendant may be punished for one but not both crimes.

Defendant was sentenced in 2021 and, as amended by Assembly Bill 518, effective January 1, 2022, section 654 now provides, in relevant part, "An act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions*, but in no case shall the act or omission be punished under more than one provision." (*Id.*, subd. (a), italics added.) For the reasons discussed, section 654 requires that the sentence on one of defendant's three crimes be stayed. Therefore, we

shall remand this matter for resentencing to allow the trial court to exercise its discretion in determining which sentence to stay.

## DISPOSITION

This matter is remanded with instructions to the trial court to stay the sentence on one of the three counts under section 654. The judgment is otherwise affirmed.


                                                    MEEHAN, J.
WE CONCUR:


DETJEN, Acting P. J.


SNAUFFER, J.